UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION et al.,

      Plaintiffs,                                      Case No. 1:13-cv-288

v.                                                          HON. JANET T. NEFF

JAMES BRUTY et al.,

      Defendants.
_____/

**OPINION**

Pending before the Court is a motion for preliminary injunction filed by Plaintiffs Stryker Corporation and Stryker Sales Corporation ("Stryker"), seeking to enjoin Defendant James Bruty, a former Stryker senior manager, from alleged competitive employment with Defendant Blue Belt Technologies, Inc. ("Blue Belt") in violation of an agreement Bruty signed with Stryker. Pursuant to FED. R. CIV. P. 65, the Court previously entered a Temporary Restraining Order (TRO). Following the parties' subsequent stipulation for discovery, and extensive briefing, on May 6, 2013, the Court conducted a hearing on the motion for preliminary injunction. Having now considered the parties' arguments in light of the record, the Court determines that Stryker's request for a preliminary injunction is properly granted.

I. BACKGROUND

Stryker, through its Instruments Division, is a global leader in the development, manufacture and sale of navigation software, equipment, and hardware, offering products in the arenas of orthopedic, neurologic, spinal, ear/nose/throat ("ENT"), and cranial surgery. Stryker invents, designs, manufactures and sells a full range of instruments and devices used in a wide variety of

surgical procedures. Stryker Navigation is the market leader in orthopedic navigation software, hardware, and equipment; its line of products assists doctors to perform surgeries by utilizing image-guided systems to more precisely insert implants or perform surgery. These products use patient-specific mapping to register portions of the patient's body during surgical procedures. [Compl. ¶¶ 22-24]

Bruty joined Stryker in 2004 as a sales representative in the Stryker Imaging business unit. He was subsequently promoted to Regional Sales Manager, and in September 2008, joined Stryker Navigation, where he was employed as Senior Director of Marketing[1] at the time of his departure and hiring by Blue Belt in January 2013 as its Vice-President of Sales and Marketing.

During his tenure at Stryker, on April 2, 2007, Bruty signed a "Stryker Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement" (herein, "Non-Compete Agreement"). In exchange, he was given stock options, which he exercised for approximately $50,000 in cash.

On December 28, 2012, Bruty gave Stryker his two-week notice that he would be leaving because he had accepted a position with 4WEB, a start-up company owned by a family friend and noncompetitive with Stryker. However, since early December 2012, Bruty had also been in contact with Blue Belt as a candidate for the Vice-President of Sales and Marketing position. Blue Belt is a company also in the medical/surgical business and recently brought to market a robotic surgical tool that assists a surgeon in cutting and sculpting bone in partial knee replacement surgeries, marketed as NavioPFS. Although Bruty had informed Stryker he was leaving to take a position with

---

[1] Bruty identifies his position as "Senior Director of Marketing" while Stryker asserts Bruty's position was "Senior Global Director of Marketing."

4WEB, he ultimately, prior to his January 18, 2013 departure from Stryker, on January 17, 2013, signed a written offer from Blue Belt, and unbeknownst to Stryker, on January 28, 2013, Bruty began working as Blue Belt's Vice-President of Sales and Marketing.

After Stryker learned on January 31, 2013 that Bruty was working for Blue Belt, Stryker sought to enforce Bruty's Non-Compete Agreement, since it was Stryker's view that Blue Belt was a competitor of Stryker, and Bruty's employment violated the Agreement. On February 8, 2013, counsel for Stryker notified Bruty and Blue Belt via letter/e-mail of its concerns that Bruty's employment violated his Non-Compete Agreement and of Stryker's intent to enforce the Agreement. Counsel for Blue Belt and Bruty responded correspondingly by letter/e-mail that Bruty's position with Blue Belt substantially differed from his position at Stryker, and Blue Belt provided assurances that Bruty would otherwise abide by his obligations against using or disclosing Stryker's confidential and proprietary information or soliciting Stryker's clients and employees.

After several communications between the parties failed to resolve this matter, on March 18, 2013, Stryker filed a three-count Complaint and Motion for Temporary Restraining Order (TRO) and Preliminary Injunction (Dkt 3) against Bruty and Blue Belt. Stryker's Complaint alleges three counts: Count 1—Breach of Contract against Bruty; Count 2—Actual and/or Threatened Misappropriation of Trade Secrets (Michigan Uniform Trade Secret Act, MICH. COMP. LAWS § 445.1901); and Count 3—Tortious Interference with Contract against Blue Belt.

On March 19, 2013, this Court granted in part and denied in part Stryker's motion for a TRO, and entered a TRO prohibiting Bruty's attendance at the American Academy of Orthopaedic Surgeons March 2013 Annual Meeting in Chicago that same week; temporarily enjoining Defendants from disclosing confidential information and soliciting Stryker customers or employees;

and ordering the return of all computer or other files and documents relating to Stryker's confidential and proprietary information. The Court subsequently granted the parties' stipulation for limited, expedited discovery pertaining to the preliminary injunction motion prior to responsive briefing and a hearing on the motion. The Court has now before it a voluminous and detailed record, along with the parties' substantial argument, to determine whether a preliminary injunction is warranted.

## II. LEGAL STANDARD

In *Mason Cnty. Med. Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977), the Sixth Circuit enunciated four factors to be considered in deciding whether to issue a preliminary injunction:

1. whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2. whether the plaintiffs have shown irreparable injury;

3. whether the issuance of an injunction would cause substantial harm to others; and

4. whether the public interest would be served by issuing an injunction.

*See also Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007).

These factors are not prerequisites that must be met, but must be balanced together. *Certified Restoration Dry Cleaning,* 511 F.3d at 542; *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell,* 467 F.3d 999, 1009 (6th Cir. 2006). The Sixth Circuit has recognized that the factors are to be balanced and that the degree of likelihood of success required may depend on the strength of the other factors. *J. Rettenmaier USA LP v. Bodner,* 1:08-cv-575, 2008 WL 2704862, at *7 (W.D. Mich. July 9, 2008) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). "[T]he likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent an injunction." *Id.* The Court is not required

to make specific findings on each of the four factors if fewer factors are dispositive of the issue, although it is generally useful to analyze all factors, particularly as an aid on subsequent review. *Certified Restoration Dry Cleaning,* 511 F.3d at 542.

As the party seeking the injunctive relief, the plaintiff bears the burden of persuasion on each of these factors. *American Standard, Inc. v. Meehan,* 517 F. Supp. 2d 976, 982 (N.D. Ohio 2007) (citing *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir. 1978)).

### III.  FINDINGS AND CONCLUSIONS

As the Court indicated at oral argument, the threshold question in this matter is whether Bruty's Non-Compete Agreement applies to his employment with Blue Belt, a question at the core of the parties' dispute. Bruty's Agreement acknowledges that the business in which Stryker is engaged is "extremely competitive" and that the materials and information Bruty had access to during his employment "regarding Stryker's technologies, know-how, products, services and sales" are proprietary and confidential to Stryker. The Agreement also acknowledges that Stryker has a legitimate interest in protecting the confidential and proprietary nature of such material and information, including relationships with existing and potential customers. The pertinent provisions of the Non-Compete Agreement at issue prohibit competitive employment for one year, the disclosure of confidential information, and the solicitation of Stryker employees or customers:

> 6.3  **Non-Compete**
>
> (a)  During my employment with Stryker and for a period of twelve (12) months after the termination of my employment with Stryker for any reason, I will not work (as an employee, consultant, contractor, agent, or otherwise) for, or render services directly or indirectly to, any **Conflicting Organization** in which the services I may provide could enhance the use or marketability of a Conflicting Product or Service by application of Confidential Information which I have had access to during my employment. A "Conflicting Organization" means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or

> development, production, marketing or selling of a Conflicting Product or Service (as defined in Section 6.1 above).
>
> The Agreement defines a "**Conflicting Product or Service**" as:
>
> any product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which resembles, competes with or is intended to resemble or compete with a product, process, technology, machine, invention or service upon which I have worked or about which I was knowledgeable during the last twenty-four (24) months of my employment with Stryker.

Non-Compete Agreement, § 6.1.

> The Agreement defines "Confidential Information" as:
>
> 2.2  "**Confidential Information**" means: know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by me during my employment with Stryker, including, but not limited to (a) prices, renewal dates and other detailed terms of customer or supplier contracts and proposals; (b) information concerning Stryker's customers, clients, referral sources and vendors, and potential customers, clients, referral sources and vendors, including, but not limited to, names of these entities or their employees or representatives, preferences, needs or requirements, purchasing or sales histories, or other customer or client-specific information; (c) supplier and distributor lists; (d) pricing policies, methods of delivering services and products, and marketing and sales plans or strategies; (e) products, product know-how, product technology and product development strategies and plans; (f) employees, personnel or payroll records or information; (g) forecasts, budgets and other non-public financial information; (h) expansion plans, management policies and other business strategies; (i) inventions, research, development, manufacturing, purchasing, finance processes, technologies, machines, computer software, computer hardware, automated systems, engineering, marketing, merchandising, and selling. Confidential Information shall not include information that is or becomes part of the public domain, such that it is readily available to the public, through no fault of me.

*Id.* at § 2.2.

With regard to Confidential Information, the Agreement further states that disclosure of such information would cause immediate irreparable injury to Stryker:

6

> 5.1 **Non-disclosure of Confidential Information.** I recognize that Confidential Information is of great value to Stryker, that Stryker has legitimate business interests in protecting its Confidential Information, and that the disclosure to anyone not authorized to receive such information, including any entity that competes with Stryker, will cause immediate irreparable injury to Stryker. … I understand and agree that my obligations not to disclose, use, disseminate, identify by subject or topic, lecture upon or publish Confidential Information shall continue after the termination of my employment for any reason.

With regard to soliciting customers, the Agreement provides:

> 6.2 **Non-Solicitation of Customers.** I agree that during my employment with Stryker and for twelve (12) months after the termination of my employment for any reason, I will not solicit business from, contact or sell any Conflicting Product or Service to, or directly or indirectly help others to solicit business from, contact or sell any Conflicting Product or Service to, any of the accounts, customers or clients, or prospective accounts, customers or clients, with whom I have had contact during the last twenty-four (24) months of my employment with Stryker, for any purpose related to the sale of any Conflicting Product or Service, including but not limited to: (a) any customer that purchased Stryker products or services, (b) any prospect that received or requested a proposal to purchase Stryker products or services, (c) any affiliate of any such customer or prospect, or (d) any of the individual customers or prospect contacts that I established.

*Id.* at § 6.2.

The Agreement likewise prohibits soliciting employees of Stryker:

> 6.4 **Non-Solicitation of Employees.** I agree that for a period of twelve (12) months after the termination of my employment with Stryker for any reason, I will not solicit, induce or influence, or attempt to solicit, induce or influence, any person engaged as an employee, independent contractor or agent of Stryker to terminate his, her or its employment and/or business relationship with Stryker or do any act which may result in the impairment of the relationship between Stryker and its employees, independent contractors or agents.

*Id.* at § 6.4.

As noted above, in executing the Non-Compete Agreement, Bruty acknowledged the purpose and reasonableness of the Agreement and the presumption of irreparable harm to Stryker:

> 7.5 I acknowledge and agree that it is reasonable and necessary for the protection of the goodwill and continued business of Stryker that I abide by the covenants and agreements contained in this Agreement during and following my employment with Stryker and that Stryker will suffer irreparable injury, loss, harm and damage if I engage in conduct prohibited in this Agreement. My experience and abilities are such that compliance with this Agreement will not cause any undue hardship or unreasonable restriction on my ability to earn a livelihood and that the restrictions on my activities during and after employment do not prevent me from using skills in any business or activity that is not in competition with Stryker.

*Id.* at § 7.5.

Given the provisions of the Non-Compete Agreement and the ample evidence that Blue Belt's business and products fall within the realm of a "Conflicting Organization" and "Conflicting Product or Service," the Court rejects Defendants' argument that Blue Belt is not a "competitor" of Stryker. Both companies target the same customers, including specifically orthopaedic surgeons, and any distinction relied on by Defendants that Blue Belt's product is limited to partial knee replacement surgery is a distinction without a difference. The evidence establishes that the technologies at issue are common to both companies, and moreover, that Stryker markets a partial knee replacement product and competes in that market. Numerous documents identify robotics products such as Blue Belt's as in the competitive market served by Stryker. Particularly conclusive is that Blue Belt viewed Stryker as a competitor. Blue Belt's 2013 Business Plan devotes specific attention to the target market for Blue Belt and identifies Stryker as a company in the "competitive landscape" (Pls. Reply, Ex. 2 at 4-5, BlueBelt 634-635).

Any argument that Stryker is merely in a non-competitive, "adjacent" market to Blue Belt is also unavailing. Stryker's market analysis documents invariably identify robotics companies as adjacent market competition, and a December 28, 2012 e-mail by Bruty acknowledges that "Stryker

Navigation has adjacent market expansion as part of our strategic plan …"[2] (Defs. Resp., Ex. 14).

Further, the Court is not persuaded by Defendants' argument that Blue Belt escapes definition as a competitor because (1) Stryker's product is simply a navigation product and Blue Belt's product includes navigation plus robotics, and (2) Stryker's robotics product is still in the development/approval stage and thus, is a future, not an existing, product. No support exists for such a narrow and arbitrary definition of the competitive market. Blue Belt's product contains a navigation component and thus competes with Stryker's product directly—the parties admit that the sale of Blue Belt's NavioPFS would invariably preclude the sale of Stryker's Navigation system to that same customer. Bruty was well-aware that Stryker has a robotics product under development, and he was privy to at least some of Stryker's plans for bringing that product to market. Blue Belt conceded at oral argument that if Stryker had a robotics product for partial knee replacements on the market, then Stryker and Blue Belt would be competitors. However, the Non-Compete Agreement is not so restricted in time, or to existing products.

The evidence fully establishes that Stryker and Blue Belt are competitors as relates to the products in question, and the Non-Compete Agreement applies to Bruty's employment with Blue Belt. Having determined that the Agreement applies, the Court turns more specifically to the factors to be considered in issuing a preliminary injunction.

A. *Likelihood of Success on the Merits*

The Non-Compete Agreement lies at the core of this legal action. The Agreement provides, and Defendants do not contest, that Michigan law applies with regard to the alleged breach of contract.

---

[2]At the time he sent this e-mail, Bruty was still employed by Stryker.

> Under Michigan law, a non competition agreement is enforceable as long as: (1) it is reasonably drawn as to its duration, geographical scope, and line of business; and (2) it protects the legitimate business interests of the party seeking enforcement. *Lowry Computer Products v. Head,* 984 F. Supp. 1111, 1116 (E.D. Mich. 1997) (Gadola, J.). Legitimate business interests must include much more than a prohibition on competition; reasonableness is based on several factors such as consideration supporting the contract, economic hardship on the employee, and whether the employer has reasonable competitive interests that need protection.

*Kelly Servs. v. Eidnes,* 530 F. Supp. 2d 940, 950 (E.D. Mich. 2008); *see also J. Rettenmaier USA,* 2008 WL 2704862, at *7.

The Court has reviewed the voluminous evidence and considered the parties' respective positions on the likelihood of success on the merits of the claims presented. The Court has determined as a threshold matter that the Non-Compete Agreement applies to Bruty's employment at Blue Belt, which addresses in large part Defendants' arguments that Stryker cannot establish the requisite showing on this factor.

With regard to the likelihood of success, "'it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.'" *J. Rettenmaier USA,* 2008 WL 2704862, at *7 (citations omitted). Stryker has prevailed with respect to an initial showing that a likelihood of success exists with respect to the counts alleged. The evidence with respect to the Bruty's Blue Belt employment, Stryker's confidential information, and the solicitation of customers and employees, establishes an ample basis for Stryker's claims of breach of the Non-Compete Agreement as well as the claims of actual and/or threatened misappropriation of trade secrets and tortious interference with contract against Blue Belt. This factor weighs in favor of the preliminary injunction.

B.   *Irreparable Injury*

The Court finds that absent a preliminary injunction, the harm to Stryker is irreparable. It is well settled in the Sixth Circuit that "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992). "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* at 512. "Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.; see also Kelly Services, Inc. v. Noretto,* 495 F. Supp. 2d 645, 659-60 (E.D. Mich. 2007).

Additionally, the unauthorized use—actual or threatened—of confidential information constitutes irreparable harm sufficient for issuance of an injunction. *Henkel Corp. v. Cox,* 386 F. Supp. 2d 898, 904 (E.D. Mich. 2005) (likelihood of success shown on claim of actual or threatened misappropriation of alleged trade secrets under Michigan law, MICH. COMP. LAWS § 445.1902); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F. Supp. 2d 525, 533 (S.D.N.Y. 2004) ("irreparable harm is presumed where a trade secret has been misappropriated, even in the absence of an employment agreement").

Here, the finding of irreparable harm is reinforced by the terms of § 7.5 of the Non-Compete Agreement, acknowledging irreparable harm and providing that an injunction may issue. Under the facts presented, including evidence that Bruty has Confidential Information as defined in the Non-Compete Agreement; some of Stryker's existing customers were targeted in Bruty's plans for sales and marketing at Blue Belt; at least some evidence that employee recruitment activity for Blue Belt targeted existing Stryker employees and was channeled to or through Bruty; and these companies

coexist in a highly competitive market, the Court is convinced that Stryker would suffer irreparable harm absent injunctive relief.

C.      *Substantial Harm to Others*

In considering whether injunctive relief will cause "substantial harm to others," a court considers the balance of hardship between the parties. *Earnings Performance Group, Inc. v. Quigley,* No. 03-73733, 2003 U.S. Dist. LEXIS 26294, at *27-28 (E.D. Mich. Dec. 15, 2003). Defendants contend that a preliminary injunction will cause substantial harm to them, and to Bruty in particular, by depriving him of an income and livelihood. However, as Stryker points out, any harm to Defendants was foreseeable and avoidable. Bruty signed the Non-Compete Agreement and evidence establishes that Blue Belt was aware of the Non-Compete Agreement prior to hiring Bruty, was advised to consider it, and in fact consulted with legal counsel concerning the Non-Compete Agreement, but chose nonetheless to proceed with hiring Bruty (*see* Eric Timko Dep. at 99-107, Pls. Reply, Ex. 1). This factor offers Defendants no shield against injunctive relief, having taken a calculated risk of harm. Additionally, the short duration of Bruty's employment with Blue Belt, less than three months, does not speak to serious harm from enjoining his services to the company while this action is resolved.

D.      *Public Interest*

The Court acknowledges that there are competing public interests at issue. In Stryker's favor, it is well-established that the public has a substantial interest in the enforcement of contractual obligations. *Kelly Services,* 495 F. Supp. 2d at 661 ("public has a substantial interest in the enforcement of valid contractual obligations"); *see also Superior Consulting Co., Inc. v. Walling,* 851 F. Supp. 839, 848 (E.D. Mich. 1994) (pointing out that the Michigan legislature has explicitly

endorsed reasonable noncompetition covenants and holding that the public interests in protecting confidential information and enforcing valid employment contracts weighed in favor of issuing the preliminary injunction).

On the other hand, as Defendants contend, developing and bringing to market an innovative robotic surgical tool and better medical technology is in the best interest of the public. However, in weighing the specific outcomes at issue in this case, the Court does not find that the latter interest is served by denying a preliminary injunction. There is no evidence that enjoining Bruty's employment with Blue Belt, in keeping with his Non-Compete Agreement, significantly hinders Blue Belt from bringing its product to market. This factor weighs in favor of Stryker.

## IV. DISPOSITION

In light of the evidence before the Court, and having considered the relevant factors, the Court is persuaded that Stryker has carried its burden of showing that the requested injunctive relief is warranted. Stryker's Motion for Preliminary Injunction is GRANTED. The TRO entered by this Court on March 19, 2013 is continued pending entry of a preliminary injunction.

## V. SECURITY

Federal Rule of Civil Procedure 65(c) provides that the court shall issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). "While ... the language of Rule 65(c) appears to be mandatory, and [] many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.,* 55 F.3d 1171, 1176 (6th Cir. 1995) (citation omitted); *Urbain v. Knapp Bos. Mfg. Co.,* 217 F.2d 810,

815-16 (6th Cir. 1954)). The parties have not set forth any positions in this regard, and the Court finds no particular purpose to be served by the posting of security under the circumstances presented and given Plaintiffs' substantial assets. The Court will continue to waive the security requirement of Rule 65(c). Defendants are free to contest this issue if they wish to do so.

      An Order consistent with this Opinion will be entered.


Dated: May 10, 2013                      /s/ Janet T. Neff
                                          JANET T. NEFF
                                          United States District Judge